DEIRDRE O'CONNOR (No. 169422)
Seamus Law, A Professional Corporation
21151 S. Western Ave.
Torrance, CA 90501
Telephone: (310) 780-4522
deirdre@seamuslaw.com

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| Lacey Sculls and Jonny Sculls<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF LOS ANGELES; WATCH COMMANDER EZETT SMITH; DOES 1-10 INCLUSIVE<br><br>Defendants. | Case No. CASE NO.<br><br>**COMPLAINT FOR DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983:**<br><br>**(1) *BRADY* VIOLATION**<br><br>**(2) SUPERVISORY LIABILITY**<br><br>**(3) *MONELL* LIABILITY— FAILURE TO TRAIN, SUPERVISE, DISCIPLINE**<br><br>**(4) *MONELL* LIABILITY—POLICY, CUSTOM, PRACTICE**<br><br>**Demand for Jury Trial** |

Plaintiffs Lacey Sculls and Jonny Sculls allege as follows:

## INTRODUCTION

1.     Plaintiffs Lacey Sculls and Jonny Sculls, a married couple (the Sculls), were the victims of a road rage incident on January 8, 2018 perpetrated by Jorge Magana while Plaintiffs were stopped at a red light at a busy intersection in Los Angeles County.

2. During Magana's violent and unprovoked assault, Plaintiffs defended themselves; all involved sustained injuries. Once Plaintiffs were able to find safety, they immediately called 911 to report Magana's attack. They later traveled to the police station and gave a full statement.

3. There were several other witnesses who called 911 during or within moments of the altercation. At least one of whom did so when Plaintiff Lacey Sculls pounded on the witness's car and yelled, "Call 911!".

4. Due to Magana's false statements, wherein he concocted an elaborate tale casting himself as the victim and Plaintiffs as would-be carjackers, Plaintiffs were ultimately arrested and prosecuted for various felony offenses.

5. Plaintiffs, through their various criminal defense attorneys, immediately and continuous requested, among other things, all statements of any percipient witnesses including all 911 calls and all videos associated with this incident.

6. Those requests were repeated throughout the prosecution.

7. The Communications Division of the Los Angeles Police Department (LAPD) has a system in place that records every 911 calls and permanently documents the phone number and other available contact information for each caller, regardless of the caller's expressed desire to remain anonymous.

8. However, LAPD has a policy designed and intended to prevent the disclosure of witnesses who request anonymity, and it trains its dispatch operators to maintain and protect the anonymity by labeling them "anonymous" and ensuring that their identifying details do not appear in the dispatch and communication records that will ultimately be provided to the prosecution and defense.

9. As a direct result of LAPD's policy and training regarding these so-called "anonymous calls," LAPD's Communication Division employees routinely withhold percipient witness identifying information from defendants, with the false claim that the information is not maintained by LAPD.

10. One of the 911 callers in this case, subsequently identified as Bridget Avendano, described Magana as the instigator who was cutting people off, slowing down traffic and waiting for the Sculls to approach the second red light. Mrs. Avendano reported that her husband, Ivan Avendano, took a video of the incident. During subsequent investigation, the Avendanos recalled taking a video of the incident but deleted the video before Sculls' defense attorney contacted them.

11. Pursuant to Defendant City's policy and training (or lack thereof) regarding 911 callers who preferred anonymity, Defendants refused to provide the identifying information until long after it was of value.

12. Thus, although the Sculls maintained their innocence from their first contact with LAPD on January 8, 2018—which they initiated—and they cooperated and provided statements at every opportunity provided, including during a custodial interrogation after they were specifically advised that they had a constitutional right not to speak to the police, they were deprived of the most critical evidence that would conclusively verify their innocence.

13. Although the assigned trial DA and the lead detective lost faith in their case against the Sculls based on extensive impeachment evidence developed during defense investigation, and were in agreement that the matter should be dismissed, Magana and his civil lawyer prevailed upon the Head Deputy to allow the prosecution to go forward. Thus, absent the video tape, the Sculls were force to defend the case at trial. Fortunately, the Sculls were resoundingly acquitted on November 1, 2019 of all charges after a very brief deliberation. They were certified factually innocent on or about February 7, 2020.

14. Had the exculpatory video been obtained early in the investigation, the case would have never been filed. Had it been obtained soon after filing, it would have led to the prompt dismissal of the case.

15. The prolonged felony prosecution of the Sculls was the direct result of LAPD's policy and its employees' compliance with same in intentionally withholding of exculpatory evidence.

## JURISDICTION AND VENUE

16. This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over the claims arising out of violations of the United States Constitution.

17. Jurisdiction is conferred by 28 U.S.C. § 1343, which provides for original jurisdiction of this Court in suits authorized under 42 U.S.C. § 1983 to redress the deprivation (under color of state law, statute, ordinance, regulation, custom, or usage) of any right, privilege, or immunity secured by the Constitution of the United States or by any act of Congress providing for equal rights of citizens of all persons within the jurisdiction of the United States.

18. The acts and omissions complained of commenced on January 8, 2018 and continued until November 1, 2019 within the Central District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

## PARTIES

19. Plaintiff JONNY SCULLS is, and at all times relevant herein was, an individual residing in the State of California, County of Los Angeles.

20. Plaintiff LACEY SCULLS is, and at all times relevant herein was, an individual residing in the State of California, County of Los Angeles.

21. At all times relevant herein, Defendant Watch Commander EZETT SMITH, Sr. PSR II, was employed by and working on behalf of LAPD and resided within the state of California. In her capacity as a Watch Commander in the Communications Division, Defendant Smith actively participated in the decision to withhold exculpatory evidence pursuant to LAPD's policy. Defendant Smith is sued in her individual capacity.

22. Other yet-to-be-identified LAPD Communications Division employees and supervisors, DOES 1-10, actively participated in this decision.

23. Defendant CITY OF LOS ANGELES is, and at all times relevant herein was, a public entity existing in the state of California. At all times relevant to this action, the Los Angeles Police Department is and was part of the City of Los Angeles.

24. Plaintiffs are informed and believe and thereon alleges that Defendants sued herein as DOES 1 through 10, inclusive, were LAPD employees and were at all relevant times acting in the course and scope of their employment and agency. Each Defendant is the agent of the other. Plaintiffs allege that each Defendant Doe was in some manner responsible for the acts and omissions alleged herein, and Plaintiffs will seek leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

## FACTUAL ALLEGATIONS
## MAGANA'S UNPROVOKED ATTACK

25. On the afternoon of January 8, 2018, the Sculls were running errands in their family vehicle—their last name SCULLS emblazoned on the license plate—with their four rescue dogs along for the ride when they had the great misfortune of crossing paths with Jorge Magana.

26. Magana recklessly crossed into the Sculls' lane of traffic, forcing Jonny Sculls to brake hard to avoid colliding into Magana's car. The sudden stop caused their pets to slam into the backs of the front seats and startled Jonny and Lacey Sculls. Jonny Sculls swore at Magana and flipped him off before proceeding on to his intended destination. Magana, however, pursued the Sculls and approached the driver's side of the Sculls car on foot while the Sculls were stuck at the next red light. Magana punched Jonny Sculls in the face through the open driver's side window just as the light turned green. Jonny Sculls drove off to escape. Magana,

again, pursued, swerving in and out of traffic and ultimately got ahead of the Sculls before both vehicles came to a stop at another red light several blocks away from Magana's first attack. Magana, again, got out of his car and approached the Sculls car aggressively—this time on Lacey Sculls side of the car. Fearing for his wife's safety, Jonny Sculls got out of his car and urged Magana to go back to his car. Magana punched Jonny Sculls again, knocking him to the ground. Lacey Sculls got out of the passenger's side to come to the aid of her husband. She stood in front of Magana and urged him to go back in his car; he kept throwing punches over her shoulder towards her husband. Lacey Sculls began banging on other cars stopped at the intersection, pleading with them to call 911. When Magana struck her husband again, she jumped on Magana. He flung her off and ultimately pulled her on top of him as the two fell into his car. Fearing for her life, and to escape his grasp Lacey Sculls bite Magana's ear. When he released her, she and her husband ran back to their SUV and drove off.

27. The Sculls were injured in the attack.

28. The Sculls called 911 from the car within minutes and reported the incident. As instructed, they went to the Topanga Station to give a full report.

## MAGANA WAITED TO CALL THE POLICE UNTIL HE HAD FIGURED OUT HIS STORY AND HAD A CHANCE TO DISCARD SOME CONTRABAND FROM HIS CAR

29. Magana called 911 approximately ten minutes after the Sculls called.

30. He needed time to find some sympathetic witnesses who could be manipulated into believing he was the victim.

31. He also needed to wait for a friend to come to the location and pick up some contraband from his car.

32. When he was ready, Magana falsely reported the incident as an attempted car-jacking, a stabbing, an unprovoked attack on him, and an attempted hit-and-run of an innocent bystander.

33. Magana's ear was injured—supposedly bad enough to justify a $2 million civil action—but not bad enough to take a ride with the paramedics to the hospital. Magana initially refused medical treatment so that he could wait on scene for the police to come by and take his statement.

## A PERCIPIENT WITNESS, WHO DESCRIBED MAGANA AS THE INSTIGATOR, HAD A VIDEO TAPE OF THE INCIDENT

34. Several percipient witnesses called with varying degrees of detail, each in its own way corroborating the Sculls account to some extent. One woman saw a man holding a woman by her sweater as he flung her onto the side of the caller's car. Others didn't see enough of the encounter to shed any light on how it started or who was the aggressor, except for Bridget Avendano, who made the call while Magana's assault was ongoing.

35. Bridget Avendano and her husband, Ivan Avendano, were positioned behind the Sculls and Magana. They saw Magana cut off the Sculls several blocks earlier. They observed Magana's reckless driving cutting off others, including the Avendanos. Bridget Avendano described Magana as the aggressor, who slowed down traffic with his erratic driving and waited for the Sculls to approach the red light before he exited his car. Before she called 911, she heard the woman (later identified as Lacey Sculls) scream for someone to call the police. Her husband video-taped the incident. When asked by dispatch if she wanted to leave her name and number, she said, "no."

36. The dispatcher marked the call as "anonymous," and did not ask Bridget Avendano to save the video for evidence.

37. No one from LAPD interview the Avendanos during the twenty-three months before trial.

38. The Sculls, through their various criminal defense attorneys, immediately and continuous requested, among other things, all statements of any percipient witnesses including all 911 calls and all videos associated with this incident.

39. It was many months before any of the 911 calls were produced and sixteen months before the Avendanos were identified. When interviewed by defense, they recalled taking a video but no longer had it. Many of the critical details of what they observed had faded from memory.

## LAPD'S POLICY TO DELIBERATELY WITHHOLD THE IDENTITY OF PERCIPIENT WITNESSES UPON THEIR REQUEST

40. The Communications Division of the Los Angeles Police Department (LAPD) has a system in place that records every 911 calls and permanently documents the phone number and other available contact information for each caller, regardless of the caller's expressed desire to remain anonymous.

41. However, LAPD has a policy to shield the identity of any 911 caller who requests anonymity.

42. Defendant City trains it dispatchers not to include the identifying information in the dispatch records. Dispatchers are trained to maintain and protect the anonymity by labeling the caller "anonymous" and ensuring that their identifying details do not appear in the dispatch and communication records that will ultimately be provided to the prosecution and defense.

43. As a direct result of LAPD's policy and training regarding these so-called "anonymous calls," LAPD's Communication Division employees routinely withhold percipient witness identifying information from defendants, with the false claim that the information is not maintained by LAPD.

## THE SCULLS MAINTAINED INNOCENCE, REFUSED ALL PLEA NEGOTIATIONS, AND DEMANDED A DISMISSAL

44. The Sculls are factually innocent.

45. However, due in part to a mistaken belief that the Sculls fled without reporting the incident, the prosecutor initially took Magana at face value and filed several serious felony charges against the Sculls, including attempted carjacking, assault with means likely to inflict great bodily injury, assault with a deadly weapon (the car), and battery with serious bodily injury.

46. The Sculls maintained their innocence from the moment of their first call to 911 on the day of the incident through the follow-up police contact they also initiated and the subsequent custodial interrogations.

47. The Sculls categorically refused to enter into any plea-bargain related to the false charges against them, including their unequivocal rejection to settle the case for a misdemeanor offense, at the trial prosecutor's repeated urging.

48. They maintained their innocence throughout the prosecution and demanded a dismissal of all charges.

## BUT FOR MAGANA'S STRENUOUS OBJECTION, THE DISTRICT ATTORNEY WOULD HAVE DISMISSED THE CASE

49. As evidence of Magana's true character and propensity for violence, his many attempts to obtain a large settlement from people who supposedly hit his car, his prior instance of perjury, and clarifications as to the timing and sequence of the Sculls reporting of this attack surfaced, the lead LAPD investigator rightfully lost faith in this case and came to believe the case should be dismissed. The assigned trial prosecutor also lost faith and advocated for the dismissal of all charges.

50. September 19, 2019, the assigned trial prosecutor notified the lead detective and Magana's civil attorney of their office's intent to dismiss the entire case.

51. However, Magana had a civil case pending wherein he sought in excess of $2 million dollars in damages. His civil lawyer, who used to work as a Deputy District Attorney, prevailed upon the Head Deputy to reconsider his decision to dismiss the matter.

52. As a result, the trial commenced in mid-October.

## FORTUNATELY, THE SCULLS ARE ACQUITTED AND CERTIFIED FACTUALLY INNOCENT

53. At the close of evidence, after a very brief deliberation, the jury quickly returned a unanimous not guilty verdict on each felony offense.

54. On or about February 7, 2020, the court granted the Sculls Petition for a Finding of Factual Innocence.

## DEFENDANT CITY'S POLICY AND PRACTICE OF FAILING TO DISCLOSE *BRADY* MATERIAL CONCERNING SO-CALLED "ANONYMOUS" 911 CALLERS

55. The unconstitutional and tortious acts of the Officer Defendants were not isolated incidents. Upon information and belief, there was a custom, policy, pattern and practice in the City of Los Angeles beginning years before this case, of condoning, encouraging, ratifying, and acquiescing in the practice of failing to disclose exculpatory evidence and/or delaying such disclosure from 911 callers who prefer anonymity until the exculpatory evidence has been lost, destroyed and/or contaminated by the passage of time. Upon information and belief, Los Angeles City policymakers were on notice of, but deliberately indifferent to these unconstitutional customs, policies and practices.

56. Upon information and belief, the LAPD, and its policymakers, as well as the individual supervisors in this case, failed to train or supervise investigators to ensure they complied with constitutional requirements in ensuring disclosure of all exculpatory and impeachment evidence, including the contact information of witnesses believed to be in possession of such evidence. Indeed, it is believed and alleged that by protecting 911 callers' anonymity at all costs, LAPD is guaranteeing the loss or destruction of exculpatory evidence.

57. The LAPD, and its policymakers, as well as the individual supervisors in this case, failed to supervise, discipline, and investigate allegations of non-disclosure or delayed disclosures against LAPD police service representative, officers, and detectives, thereby creating a culture of misconduct and emboldening its employees to engage in misconduct.

58. This unconstitutional policies and practices directly and proximately caused the Sculls' wrongful arrests and prolonged prosecutions. LAPD's policy to shield the identity of percipient witnesses and failure to preserve the exculpatory video let to the destruction of exculpatory evidence.

59. The misconduct of Defendants, all of whom are current or former employees of the LAPD, involved acts and omissions occurring with the scope of their employment with the LAPD. Accordingly, the City of Los Angeles is responsible for paying any judgment, compromise, or settlement reached in this action.

## PARTICIPATION, STATE OF MIND AND DAMAGES

60. Defendants' acts and omissions deprived the Sculls of their civil rights under the First, Fourth, Fifth, Sixth and Fourteenth Amendments to the United States Constitution.

61. This action seeks damages for the period from January 8, 2018 to the present. The Sculls' liberties were curtailed upon their arrest on February 13, 2018.

They were incarcerated until they could post bond, formally charged, followed by a nearly two-year fight to clear their names. The damages suffered by Jonny and Lacey Sculls continue to the present.

62. Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved and acquiesced in the violations alleged herein.

63. As joint actors with joint obligations, each Defendant was and is responsible for the failure and omission of the other.

64. Each Defendant acted individually and in concert with the other Defendants and others not named in violating Plaintiffs' rights.

65. Defendants' unlawful, intentional, willful, deliberately indifferent, reckless, and bad-faith acts and omissions caused Plaintiffs to be prosecuted on for nearly two-years.

66. As a direct and proximate result of these unlawful, intentional, willful, deliberately indifferent, reckless, and bad-faith acts, omissions, customs, practices, policies, and decisions of the Defendants, Plaintiffs have suffered the following injuries and damages, which continue to date and will continue into the future: personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; damage to business and property; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which she is entitled monetary relief; fright; nervousness; anxiety;

shock; humiliation; indignity; embarrassment; harm to reputation and apprehension; which have caused Plaintiffs to sustain damages in a sum to be determined at trial.

67. These injuries and damages were foreseeable to Defendants at the time of their acts and omissions.

68. Defendants' acts and omissions, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiffs entitling Plaintiffs to exemplary and punitive damages from each individual Defendant in an amount to be proven at trial.

69. By reason of the above-described acts and omissions of Defendants, Plaintiffs were required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiffs that they might vindicate the loss and impairment of their rights, and by reason thereof, Plaintiffs request payment by Defendants of a reasonable sum for attorney fees pursuant to 42 U.S.C. § 1988.

## COUNT I

## 42 U.S.C. § 1983 – *BRADY* VIOLATION

## (Against all Individual Defendants)

70. Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

71. Defendant Smith and Does 1-10 deprived the Sculls of the right to due process by withholding material exculpatory and impeachment evidence from the prosecutor and criminal defense in violation of the Constitution and *Brady v. Maryland,* 373 U.S. 83 (1963) and its progeny.

72. Due process demands that the Government's disclosure of *Brady* material must occur at a time when the evidence can be of use and value to the defendant.

73. The individual Defendants either directly participated in, or knew that the contact information for each 911 caller was permanently maintained within LAPD's communications record-keeping system regardless of the caller's requests for anonymity, that LAPD had a policy against disclosure to protect anonymity, and, in accordance with that policy, each Defendant deliberately failed to timely disclose to anyone, including the investigating LAPD officer, the identifying information until long after the exculpatory video was destroyed and/or the percipient witnesses' detailed, contemporaneous memories had been contaminated. Simply put, Defendants knew where the identifying information was stored and how to retrieve it. They nevertheless failed to disclose it as they were constitutionally required to do. Indeed, when repeatedly asked if such information exists, Defendants affirmatively and repeatedly lied and denied its existence.

74. They continued to do so for sixteen months. By then, the video had been destroyed and the witnesses' recollection of what they observed had significantly deteriorated, resulting in the loss of irrefutable evidence of the Sculls innocence in violation of their constitutional right to due process.

75. In light of the reported observations describing Magana as the instigator, the exculpatory value of a video capturing Magana's assault was apparent and it could not have been obtained by any other means. It would have conclusively established that the Sculls were acting in self-defense. Further, as any reasonable person would expect, the detailed memories of the witnesses had understandably deteriorated significantly during the unjustifiable and unconstitutional 16-month delay in the disclosure. This unjustifiable delayed disclosure violated Plaintiffs' right to due process.

76. Had the suppressed identifying information been timely disclosed, the exculpatory video—the unequivocal proof of the Sculls innocence—would have been preserved for eternity, as would the details and of the witnesses' contemporaneous recollections. This evidence would have eviscerated any claim of probable cause and precluded the arrest and/or continued prosecution. The Sculls never would have been forced to endure the public humiliation, expense and stress of defending against serious felony charges for nearly two years.

77. The foregoing acts and omissions were deliberate, reckless, wanton, cruel, motivated by evil motive or intent, done in bad faith, or involved callous indifference to the Sculls federally protected constitutional rights. These acts were perpetrated while Defendants were acting in their capacities as employees or agents of the City of Los Angeles and under color of state law. No reasonable officer would have believed the foregoing conduct was lawful.

78. As a direct and proximate result of Defendants' actions, the Sculls were wrongly arrested, detained, charged with several serious felonies, prosecuted for twenty-one months, denied a dismissal despite the detective's and trial prosecutor's misgivings about the case, forced to go to trial, and suffered the other grievous injuries and damages set forth above.

## COUNT II

## 42 U.S.C. § 1983 – Supervisory Liability Claim (Does 1-10)

79. Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

80. Plaintiffs' prosecution was caused by the unconstitutional action and inaction of Does 1-10, acting in their individual capacities and color of law.

81. Upon information and belief, Does 1-10 directly participated in the misconduct that resulted in Plaintiffs' wrongful prosecution, including but not limited to knowingly withholding the identity of the 911 caller who had exculpatory video evidence of the incident. Specifically, upon information and belief, Plaintiffs allege that Does 1-10 knew where the 911 caller's identifying information was stored and how to retrieve it from the system, yet instructed their staff not to disclose the phone number, not even to the assigned investigator. Does' deliberate unconstitutional actions and inaction thereby enabled and prolonged a prosecution based on false evidence.

82. Does 1-10 knowingly refused to ensure the timely disclosure of exculpatory evidence, which, upon information and belief, they knew or should have known would have precluded any prosecution or would have resulted in the dismissal of all charges.

83. Does1-10 culpably failed to adequately train, supervise, and control their subordinates, including those civilian employees in the Communications Division.

## COUNT III

### 42 U.S.C. § 1983 – *MONELL* CLAIM
### Failure to Train, Supervise or Discipline in *Brady* Duties
### (Against the City of Los Angeles)

84. Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

85. Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, Defendant City of Los Angeles, by and through its policymakers, created and maintained a custom, policy and practice of *failing* to train, supervise or discipline their employees and agents, including Defendants, regarding their obligations to document and disclose the identity of all percipient witnesses, including 911 callers who wished to remain anonymous; and regarding their obligation to ensure that the assigned investigators knew how and where to retrieve that information so that it could be turned over to the prosecution and criminal defense attorneys regardless of the callers request for anonymity.

## COUNT IV

### 42 U.S.C. § 1983 – *MONELL* CLAIM
### Unconstitutional Policy, Practice and Custom
### (Against the City of Los Angeles)

86. Plaintiffs hereby incorporate each of the allegations of this Complaint as if fully set forth herein, and further allege as follows:

87. Defendant City of Los Angeles, by and through its policymakers, created and maintained a custom, policy and practice of shielding the identity of 911 callers who requested anonymity that were substantially certain to cause *Brady* violations, and maintained these policies and procedures in deliberate indifference to the obvious risk these constitutional violations would result.

88. These unconstitutional customs, policies and practices of the City of Los Angeles proximately and directly caused the Sculls physical and constitutional injuries, including their arrest, prolonged prosecution, and other damages described above.

## JURY DEMAND

89. Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs request a jury trial on all issues and claims set forth in the Complaint.

## PRAYER FOR RELIEF

90. **WHEREFORE**, Plaintiffs respectfully request:

    a.    A trial by jury on each of Plaintiffs' claims;

    b.    That the Court award compensatory damages to Plaintiffs against Defendants, jointly and severally, in an amount to be determined at trial;

    c.    That the Court award punitive damages to Plaintiffs, and against Defendants, in an amount to be determined at trial, to deter such conduct by Officer Defendants in the future;

    d.    For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

    e.    For any and all other relief to which they may be entitled.

DATED: October 30, 2021    SEAMUS LAW, A PROFESSIONAL CORPORATION

By: /S/ *Deirdre O'Connor*
    Deirdre O'Connor
    Attorney for Plaintiffs